## H. S. HAGAR et al., Respondents, v. JOHN H. CLARK et al., Appellants.

The general owners of a vessel chartered for a voyage will be deemed to be the owners for the voyage, and their rights and authority as owners to continue, unless there be some clear and determinate transfer of them ; the presumption is against such a transfer.

The entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage.

Plaintiffs, being the owners of a steamship, executed a charter-party, by which, as said owners, they agreed on the freighting and chartering of the whole of the vessel, with the exception of the necessary room for the crew and storage of provisions, sails and cables, or sufficient room for the cargo thereinafter mentioned, unto defendants "for a voyage from New York to New Orleans and back." The charter-party was executed and took effect July 27, 1865. Plaintiffs agree therein that the vessel shall be ready for the cargo July 31st; that it shall receive on board the merchandise mentioned in the charter-party; and that no other goods or merchandise other than defendants' shall be laden on board. Defendants agree "for the cargo or cargoes to be received and delivered within reach of the vessel's tackles at port of lading and discharging." The lay days were to commence "from the time the captain reports himself ready to receive or discharge cargo." Defendants agree to pay "for the use of said vessel during the voyage" $7,000, and all expenses, so as to secure that sum net to the owners ; save in case of accident to the machinery, whereby the vessel is detained for repairs ; in which case the actual expenses, including victualling and manning, are to be paid by the owners    There were no words of grant or demise, or any declaration that the charterers were to take the vessel into their possession, or that they were to man, equip, furnish or control her. During the voyage the boiler gave way, through the negligence of the engineer, by reason whereof the vessel was delayed. In an action to recover a balance of the sum stipulated by the charter-party, with expenses and demurrage, held, that the charter-party was simply a contract of affreightment; that by it defendants did

not become lessees of the vessel or acquire control over it, but simply acquired a right to have their goods conveyed; that plaintiffs retained the legal possession, with all the rights and responsibilities of owners, and were therefore liable for damages resulting to defendants from the negligence of the engineer, which they were entitled to counter-claim. *Hager* v. *Clark* (12 Hun, 524), reversed.

(Argued May 29, 1879; decided September 16, 1879.)

Appeal from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of plaintiffs, entered upon the report of a referee. (Reported below, 12 Hun, 524.)

This action was brought to recover a balance alleged to be due of the sum stipulated to be paid under a charter-party, executed by the parties, and for expenses and demurrage.

The following is a copy of the charter-party.

"This charter-party, made and concluded upon in the city of New York the twenty-seventh day of July, in the year of our Lord eighteen hundred and sixty-five, between J. P. Manton, agent for owners of the steamer *H. S. Hagar* of New York, of the burthen of 1,113 tons or thereabouts, register measurement, now lying in the harbor of New York, of the first part, and Messrs. H. B. Cromwell & Co., merchants of New York, of the second part, witnesseth : that the said party of the first part agrees on the freighting and chartering of the whole of the said vessel (with the exception of the necessary room for the crew and stowage of provisions, sails and cables) or sufficient room for the cargo hereinafter mentioned, unto the said party of the second part, for a voyage from New York to New Orleans and back to New York, on the terms following : The said vessel shall be tight, staunch, strong and in every way fitted for such a voyage, and receive on board during the aforesaid voyage the merchandise hereinafter mentioned, and no goods or merchandise shall be laden on board, otherwise than from the said party of the second part or their agent. The said party of the second part doth engage to provide and furnish to the said vessel such cargo of lawful merchandise as they

may see proper, and to pay said party of the first part or agent, for the use of said vessel during the voyage aforesaid, seven thousand dollars for the voyage and all expenses, including stevedores' bills, officers' and crews' wages, stores and supplies, coal and everything requisite for the voyage ; also levee dues, wharfages, health bills, port charges, pilotages, and everything pertaining to the voyage, including government tax, leaving a net sum of seven thousand dollars to the owners, payable as follows : three thousand dollars on discharge of the cargo at New Orleans, and the balance, four thousand dollars, on discharge of the cargo at New York. It is agreed that the lay days for loading and discharging shall be as follows : commencing from the time the captain reports himself ready to receive or discharge cargo. Vessel to be ready to receive cargo on the thirty-first July, and to sail on the second August ; to sail from New Orleans within seven running days from arrival there, and to be discharged within three running days from arrival in New York, exclusive of Sunday, and that for each and every day's detention by default of said party of second part or agent two hundred and fifty dollars per day, day by day; shall be paid by said party of second part or agent to said party of the first part or agent. The cargo or cargoes to be received and delivered within reach of vessel's tackles at ports of loading and discharging. In case of accident to machinery whereby vessel is detained for repairs, the actual expenses including victualling and manning thereby incurred are to be paid by owners. To the true and faithful performance of all and every of the foregoing agreement, we, the said parties, do hereby bind ourselves, our heirs, executors, administrators and assigns, each to the other, in the penal sum of seven thousand dollars.

"In witness whereof, we hereunto set our hands, the day and year first above written.

  (Signed)   "JOS. P. MANTON,
      "*Agent Steamship H. S. Hagar.*
    "H. P. CROMWELL & CO."

Statement of case.

The answer set up as a counter-claim among other things that the vessel was not manned by a competent crew, and thereby the boilers and machinery became broken and deranged, and she was in consequence delayed upon her voyage to defendants' damage, etc.

The steamer left New York August 2, 1865, laden with a cargo shipped by defendants. About twenty-four hours thereafter her boiler gave way, as the referee found, because of the negligence of the engineer in allowing the water to get too low. She was delayed in consequence and did not reach New Orleans until August thirty-first, the ordinary length of a voyage being nine days. Defendants proved damages to a large amount consequent upon the delay, these the referee refused to allow.

*Jno. E. Parsons*, for appellants. The injury to the vessel having been caused by the negligence of her engineer was not caused by accident. (Brown's Law Dict. Accident; Bouvier's Law Dict. Accident; Wharton's Law Dict. Accident; Burrill's Law Dict. Accident; *Weaver* v. *Ward*, Hobart, 134; *Underwood* v. *Hewson*, 1 Strange, 596; *Center* v. *Tinney*, 17 Barb., 94; *Vincent* v. *Cook*, 4 Hun, 318; *Merrit* v. *Earle*, 29 N. Y., 115; *Castle* v. *Duryee*, 2 Keyes, 169; *Jetter* v. *N. Y. and Harlem R. R. Co.*, id., 154; *Wendell* v. *The Mayor, etc.*, 4 id., 261; *Austin* v. *New Jersey Steamboat Co.*, 43 N. Y., 75; *Webb* v. *Rome, W. and O. R. R. Co.*, 49 id., 420.) Plaintiffs, the owners, were responsible for the engineer's negligence. (*Clarkson* v. *Edes*, 4 Cow., 470; *Fenton* v. *City of Dublin S. P. Co.*, 8 A. & E., 835; Abb. on Shipp., 365, note; *The Schooner Volunteer*, 1 Sum., 550; *Certain Logs of Mahogany*, 2 id., 559; 1 Pars. on Shipp. and Ad., 278, 282; *Donahue* v. *Kettell*, 1 Clifford, 135; *The Aberfoyle*, Abb. Adm., 242; *Lyman* v. *Redman*, 23 Maine, 289; *Drinkwater* v. *Spartan*, Ware, 149; *Saville* v. *Campion*, 2 B. & A., 503; *Omour and Cleveland Coal and I. Co.* v. *Huntley*, 25 W. R. C. P. Div., No. 53, April, 1877; *Flushing Ferry* v. *U. S.*, 6 Const. Claims, 1; *The Vincennes*, 3

Ware, 171.)   The question whether the owner or the char-
terer is liable for damage caused by the negligence and
unskillful management of the vessel is determined by the
terms of the charter party, as explained by the circumstances
of each particular case. (Abb. on Shipp. [11th ed.], 45;
*Hooe* v. *Groverman*, 1 Cranch., 314; *Ship Blariean*, 2 id.,
240.)

*John S. Washburn*, for respondents.   The clause in the
charter-party, " with the exception of the necessary room
for the crew and stowage of provisions, sails and cables," did
not constitute a reservation of a portion of the vessel.
(*Trinity House* v. *Clark*, 4 M. & S., 288; Abb. on Shipp.,
47–49, 391, and note ; *Hutton* v. *Bragg*, 7 Taunt., 14; *Sher-
man* v. *Fream*, 30 Barb., 478; *Gracie* v. *Palmer*, 8 Wheat.,
605; *Vallejo* v. *Wheeler*, Cowper, 143, 147; *Marcardier* v.
*Chesapeake Ins. Co.*, 8 Cranch., 49; *Hooe* v. *Groverman*, 1
id., 214; *Morgan* v. *U. S.*, 14 Wal., 531; *McIntyre* v.
*Bowne*, 1 J. R., 229, 238; *Taggard* v. *Loring*, 16 Mass.,
336, 339; *Hallett* v. *Col. Ins. Co.*, 8 J. R., 272, 275;
*Reynolds* v. *Toppan*, 15 Mass., 370; *Williams* v. *Johnson*,
11 Barb., 501; *Holmes* v. *Pavenstedt*, 5 Sandf., 97; *Mac-
taggart* v. *Henry*, 3 E. D. S., 390; Pars. Mer. Law, 357.)
The burden of proving that, at the time the " Hagar" sailed
for New Orleans, she was not staunch, strong and in every
way fitted for the voyage rested upon defendants.  (Abb.
on Shipp., 247; 1 Greenl. on Ev., § 74; 2 id., § 247.)  The
detention was caused by an accident, and plaintiffs cannot be
held responsible therefor.  (*Patrick* v. *Hallett*, 1 J. R., 246.)

DANFORTH, J.   The plaintiffs are the owners, and the
defendants the charterers, of the steamship Hagar.   The
plaintiffs claim that by the charter party they so changed
their relation to the vessel that the defendants became the
owners for the voyage, and upon this ground have recovered
judgment.   We are therefore by an examination of its cove-
nants and stipulations to ascertain whether it operates as a

demise of the ship itself, or whether all that the charterers acquired under it was the right to have their goods conveyed by the vessel. If the first, the decision of the court below was correct, for the charterers would thereby become for the time being the owners of the vessel, the captain, engineer and crew their servants, and the possession of the ship would follow. If on the other hand it does not so operate, then the ownership remained, notwithstanding the charter party, in the original owners, and the judgment appealed from could not be sustained; 1 Parsons on Shipping and Admiralty, 278; *Drinkwater* v. *Brigg Spartan* (1 Ware, 145); *Eames* v. *Cararoc* (1 Newb., 528); *Sherman* v. *Fream* (30 Barb., 478), and if it remains doubtful whether the charterers were to have the sole possession and control of the vessel during the voyage, or were to be constituted its owners *pro hac vice*, then the general owners must be deemed such for their rights and authority continue until displaced by some clear and determinate transfer of them ; (*Certain Logs of Mahogany*, 2 Sum., 589; *The Aberfoyle*, 1 Abb. Ad. Rep., 242.) The legal presumption is in favor of the continuance of ownership and against any transfer of the ship to the charterer for the voyage, and is said to be so strong that if the end sought to be effected by the charter party can conveniently be accomplished without the transfer of the vessel to the charterers, courts of justice are not inclined to regard the contract as a demise of the ship, although there may be express words of grant in the formal parts of the instrument. (*Donahoe* v. *Kettell*, 1 Clifford, 135; Pars. on Ad. and Ship., 278; 2 Pars. on Con., 437.) The precise question then to be answered is, in the language of the learned court below, "whether there has been an entire letting or parting with the possession of the ship, so that during the voyage the absolute owner has surrendered his control over her," for whatever difference there may have been in the construction of particular phrases or terms of a charter party it is well settled that entire command and possession of the vessel and consequent control over its navigation must be surrendered

to the charterer before he can be held as special owner for the voyage. (*McIntyre* v. *Bowne*, 1 J. R., 229; *Hooe* v. *Groverman*, 1 Cranch., 214; *Marcardier* v. *Chesapeake Ins. Co.*, 8 id., 49; *Clarkson* v. *Edes*, 4 Cow., 470; *Drinkwater* v. *Brig Spartan*, 1 Ware., 149; *Donahue* v. *Kettell*, *supra*; *Leary* v. *U. S.*, 14 Wall., 611.) And this is the theory upon which this action is brought.

In view of these rules the plaintiffs cannot prevail upon any loose or vague provisions in the instrument under which they claim. In the first place it should be noticed that there are not in the charter party any words of grant or demise, nor is the vessel in terms let to hire, nor is there any express declaration that the charterers are to take the vessel into their own possession, or that they are to man, equip, furnish, or control her, or that they are to receive or manage her. We are next to inquire whether there are any equivalent words or whether an intent to change the ownership can be gathered from the terms and tenor of the contract. The owners "agree on the freighting and chartering of the whole of the vessel with the exception of the necessary room for the crew and stowage of provisions, sails and cables or sufficient room for the cargo thereinafter mentioned," unto the defendants "for a voyage from New York to New Orleans and back to New York" on certain specified terms. Taking these words literally it is obvious that the defendants did not acquire the right to the whole vessel for they were to have no more of it than was necessary for the cargo, nor so much, if it did not leave room for the crew and their provisions and the ship's clothing and cables. They did not become lessees of the vessel, but freighters entitled to have their goods loaded and stored therein so far as could be done without encroaching on that portion of the vessel which was excepted ; — that portion therefore remained in possession of the owners. If the question were a new one, this would itself seem an answer to the plaintiffs' assertion — what space is excepted ? how much is necessary for the purpose indicated ? Who shall determine this and mark the bounda-

ries of the grant? And if the charterers encroach, who is to be a party plaintiff in the issue? No one but the owner. Upon such a controversy as is thus suggested, arising on a similar clause, it was held to be a question for the jury, to determine how much space was necessary,—(*Almgren* v. *Datilh*, 5 N. Y. 28). The clause in question seems to exclude any intention on the owners' part to give up the control of the vessel and such was the conclusion in *Jackson* v. *Edes* (4 Cow. 470) where a similar clause was held to qualify general words demising the whole vessel to the charterers. In the next place—the plaintiffs have by the express terms of the charter party undertaken duties in respect to the vessel and obligations to the charterers which could not be performed unless they remained owners of the vessel and had control over it. Although the charter party was executed and took effect on the 27th day of July, the plaintiffs agree therein that the vessel shall be ready for the cargo on the 31st of July; this is a material provision. It is the obligation of the plaintiffs as owners entered into with the defendants as charterers and clearly implies that they were, and the defendants were not at that time in control of the vessel.

The covenant is a condition precedent to the defendants' obligation to furnish a cargo. But the plaintiffs agree, not only that the ship shall be *ready* to receive a cargo on the 31st of July, but, also, that it shall receive on board during the voyage, the merchandize mentioned in the charter party, and that no goods or merchandize shall be laden on board otherwise than from the defendants. These covenants are inconsistent with any relation of the plaintiffs to the vessel but that of owners—not only general owners but owners for the voyage. There is next a covenant of the defendants with the plaintiffs for "the cargo or cargoes to be received and delivered within reach of vessel's tackles, at port of loading and discharging." This implies the concurrence of two parties, but if the vessel was let to the defendants, if by the charter party entire possession and control had been

secured to them, there was no necessity for, or meaning in, these covenants? If the charterers were the owners they could load or unload at such places as might suit their convenience; but by whom are the cargo or cargoes to be received? As the plaintiff contends, by the charterer, as the defendants contend by the owner. From whom is the cargo to be received? By the construction of both, and the plain letter of the charter it is to be received from the charterer. Can that construction be correct which makes the party receiving and the party delivering one and the same? Such is the effect of the plaintiff's contention, and it is I think not the true one. If the owners retained control over the vessel and its management the covenants hereinbefore referred to are natural and have an obvious meaning and force. If not they are senseless. (*Clarkson* v. *Edes, supra.*) Again, the lay days are to commence from the time the captain reports *himself* ready to receive or discharge cargo; and the freight money is to be paid, part on discharging the cargo in New Orleans, and part on discharging in New York. Are both of these events optional with the charterers? Each is a condition precedent to the performance of a duty by the defendants and, in the absence of some clear provision to the contrary, I think the captain, whose readiness to receive or discharge the cargo gives effect to the defendants' duty to deliver or receive it and their obligation to pay must be deemed the plaintiffs' agent and not the agent of the defendants. These provisions are all for the benefit of the owners, upon whom the duty devolves of loading, stowing and discharging the cargo; a duty to be performed by the captain and crew. We are not to suppose that these stipulations were needlessly written into this contract but on the other hand are to assume that the parties attached importance to each provision. No reason appears for disregarding them; they are appropriate and belong to such an instrument as the one before us, and that construction must be favored which gives to them a sensible effect. (2 Pars. on Con., 494.)

We can find nothing to indicate that the charterers were to provide the officers or crew; certainly it is not so expressed and the implication is otherwise. In that respect the charter party is in harmony with the general rule which requires the owner to victual and man the vessel, unless there is a contrary stipulation in the charter party, or its nature and object devolve that duty on the charterer. (7 Abb. on Ship., [Am. ed.], 349, mar. 247; *The Vincennes,* 3 Ware., 171; *Work* v. *Leathers,* 97 U. S. R., 379.) The plaintiffs rely upon the words of the charter party by which compensation to the owner is provided for, but this is not inconsistent with the construction which makes the charter party a mere covenant for the transportation of merchandize. The only liability incurred by the charterers is to the owners, and if the design was (as the writing says) to secure to the owners a " net sum " or clear profit of $7,000 over and above expenses, it was a sensible and proper stipulation, upon the theory that the plaintiffs remained, after the charter party as before owners of the vessel and bound to make its disbursements — but it was not necessary if the defendants became from the time of the making of the charter party the special owners of the vessel. The first clause of this covenant throws light upon the last. By the first clause the charterers are to provide and furnish the vessel a cargo, and by the last they are to pay the owners as above stated. Clearly in both clauses the promise is by a charterer not a special owner; else the special owner, or owner for the voyage is guilty of the absurdity of promising to furnish his own vessel a cargo. In *Clarkson* v. *Edes* (*supra*), the charterer was to pay $325 each month during the voyage, together with all and every port charge excepting at the port of New York. In *MacTaggert* v. *Henry* (3 E. D. Smith, 390), the charterer was to pay for the charter or freight of the vessel $1,300 with all foreign port charges, including pilotage, lighterage, consul fees, etc. In neither of those cases was the charterer held to be the owner, nor was the method of payment considered important as bearing on that question. Nor can it be. It is simply a

mode of providing that the owners of the ship shall receive, after paying expenses, a sum named. It has no tendency to show that the captain and other officers were to be appointed by the defendants. Even an agreement to pay would not imply an obligation to employ (*Keen* v. *Audenried*, 5 Benedict, 535) ; but here there is no agreement to pay any one except the owners, and, taking the several clauses together, the obligation on the part of the defendants is none other than to make the plaintiffs whole in the matter and leave to them in addition $7,000.

Again, this agreement to freight and charter is for a single voyage from New York to New Orleans and back to New York, to be completed as the parties contemplated in a very short time, and in fact ending within three months ; the object to be accomplished was the transportation of goods and merchandize between those cities. There was nothing then in the nature of the service, or the due attainment of the object sought to be accomplished by the charter party, which required that the vessel should be absolutely under the control of the charterers. In short, we find nothing in the object of the charter party or its covenants which indicates that the general owners parted with possession of the vessel or that the defendants acquired control over it ; but on the contrary much to show that the charter party is a mere contract by which the plaintiffs let the use of the vessel to freight ; themselves retaining the legal possession and liable to all the responsibilities of owners.

The judgment appealed from was rendered upon a different and, as we think, erroneous construction of the charter party. It should therefore be reversed and a new trial granted, with costs to abide the event.

All concur.

Judgment reversed.